**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| MICKEY ANN LIVEOAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-cv-678-CVE-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Mickey Ann Liveoak seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

**INTRODUCTION**

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a twenty-nine year old female, applied for Title II and Title XVI benefits on May 6, 2010, alleging a disability onset date of March 28, 2009. (R. 165-68, 169-73). Plaintiff's last insured date under Title II was December 31, 2009. (R. 56, 60). Plaintiff alleged that she was unable to work due to injuries sustained in a motor vehicle accident, including back and neck pain, headaches, right foot pain, and depression. (R. 240). Plaintiff's claims for benefits were denied initially on September 16, 2010, and on reconsideration on October 20, 2010. (R. 56-71). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 81-83). The ALJ held a hearing on July 12, 2011. (R. 24-53). The ALJ issued a decision on August 13, 2011, denying benefits and finding plaintiff not disabled. (R. 6-23). The Appeals Council declined plaintiff's request to review the case; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1-5).

Plaintiff timely appealed the Commissioner's decision. (Dkt. # 2). On appeal, plaintiff alleges two points of legal error: (1) that the ALJ's use of boilerplate language in the residual functional capacity and credibility findings constitutes reversible error; and (2) that the ALJ improperly relied on the vocational expert's testimony regarding other work, which contradicted the listings in the <u>Dictionary of Occupational Titles</u> and the ALJ's hypothetical. Plaintiff has made no challenges to any of the ALJ's factual findings, other than the reliance on the vocational expert's testimony; therefore, the undersigned will provide only a brief overview of the underlying facts of the case.

3

**The ALJ's Decision**

The ALJ found that plaintiff had severe impairments of "status post back and neck injuries from motor vehicle accident and affective mood disorder." (R. 11). Plaintiff had not performed any substantial gainful activity since March 28, 2009, the day of the motor vehicle accident. Id. The ALJ determined that plaintiff's complaints of headaches were not substantially proven, and he categorized those headaches as a nonsevere impairment. (R. 12).

After reviewing the listing for disorders of the spine (Listing 1.04A), the ALJ determined that plaintiff's back and neck injuries did not meet or medically equal a listing. Id. The ALJ also evaluated plaintiff's mental disorder using the "paragraph B" criteria. (R. 12-13). He concluded that plaintiff had moderate difficulties with activities of daily living; social functioning; and concentration, persistence, and pace. Id. Plaintiff had also experienced one to two episodes of decompensation. (R. 13). Despite these limitations, however, plaintiff did not meet or medically equal the listing for affective mood disorders. (R. 12-13).

The ALJ then reviewed the evidence to determine plaintiff's residual functional capacity. At the hearing, plaintiff testified that she suffered back and neck injuries and migraine headaches. (R. 14). She also complained of right foot pain at the hearing. Id. Plaintiff testified that she was always uncomfortable from pain and had difficulty sleeping. Id. Her migraine headaches occurred three to four times a week and lasted the entire day. Id.

Plaintiff testified that she spent 80% of each day in bed. Id. Her pain prevented her from doing any household chores. Id. She required assistance with dressing but was otherwise able to bathe and groom herself. Id. Plaintiff could only stand and sit in thirty minute increments, could only walk one-half block, and could lift only ten pounds. Id. She also stated that she had trouble picking up and holding things. Id. With respect to plaintiff's mental health issues, plaintiff

4

testified that she had daily mood swings that included crying spells. (R. 14). She testified that she had left previous jobs due to her mood swings and that she does not like people telling her what to do. Id. Despite these issues, plaintiff had "never" had any mental health treatment. Id. Plaintiff stated that she did not have health insurance, which also explained why she had stopped receiving treatment for her back injury in 2009 and had last taken medication for her pain in 2010. Id.

The medical evidence demonstrated that plaintiff had sought treatment in the emergency room for back and neck pain on March 29, 2009, the day after she was involved in an automobile accident. Id. Although plaintiff had full range of motion, she was diagnosed with acute cervical strain, acute dorsal strain, and acute lumbar strain. (R. 14-15). Subsequent MRI scans were unremarkable, showing only "subtle bulges" at C3-C4 and C4-C5. (R. 15). Plaintiff also suffered an injury to one of the toes on her right foot, which was repaired with surgery in June 2009. Id. Plaintiff received pain management care from April through October 2009 and also received chiropractic care. Id. She was ultimately released at maximum medical improvement in October 2009. Id. At that time, plaintiff had some issues with range of motion, reflexes, and strength, causing her doctor to conclude that plaintiff "had indeed suffered and sustained an injury as a result of motor vehicle accident." (R. 16). Plaintiff "had sustained cervical, lumbar somatic dysfunction and right first and third toe contusions with surgery." Id. Her doctor released her with prescriptions for pain medications and instructions to follow up with her primary care physician. (R. 15).

Plaintiff received a physical consultative examination in June 2010. (R. 16). She complained of neck and back pain, "alleviated by nothing, and exacerbated by movement and standing." Id. Plaintiff reported that she was unable to work because she could not sit or stand for

long periods of time. (R. 16). Despite these complaints, she was only taking Tylenol, in its over-the-counter formulation, for pain. Id. The consultative examination revealed "decreased range of motion of the back in extension and flexion, of the neck in extension, and of the bilateral hips in flexion. All other ranges of motion were within normal limits." Id. The examining physician found no other limitations. Id. Plaintiff did complain of pain in her lower back with toe and heel walking. Id. The consultative examining physician assessed plaintiff as having "chronic cervical pain and chronic thoracic/lumbar pain." Id.

Plaintiff also received a consultative mental examination in August 2010. Id. Plaintiff told the psychiatrist that she did not "get along" well with co-workers when she was working or with her family members. Id. Plaintiff reported mood swings, depression, and occasional suicidal thoughts. Id. She described feeling "happy one minute and angry the next." (R. 17). Plaintiff stated that she had never received medication or counseling for her mental health issues. Id. The examining psychiatrist believed that plaintiff might have "bipolar II." Id.

The ALJ assessed the opinion evidence, including those opinions rendered by agency physicians. Id. He gave great weight to the opinions of the agency's psychiatric doctors, but he only gave some weight to those agency physicians who evaluated plaintiff's physical capacity to work, finding that plaintiff's limitations were more severe than those imposed by the agency physicians. (R. 17). The ALJ concluded that plaintiff retained the residual functional capacity to perform "less than the full range of light work," with limitations on occasionally climbing, balancing, stooping, kneeling, crouching, crawling, and reaching overhead. (R. 13). Plaintiff was also limited to simple, routine, repetitive tasks and should have no contact with the general public. Id. Plaintiff was able to interact appropriately with co-workers and supervisors for the purpose of carrying out work duties. Id.

While plaintiff could not perform her past relevant work, which required dealing with the general public, the ALJ found that plaintiff could perform other work. (R. 18). Relying on the testimony of the vocational expert, the ALJ found that plaintiff could work as an assembler, a laundry worker, or as a file clerk.[1] Id. Because plaintiff could perform other work, the ALJ concluded that plaintiff was not disabled and denied her applications for benefits. (R. 19).

**Plaintiff's Medical Records**

The ALJ's decision provides a good overview of the medical evidence. Plaintiff was involved in a motor vehicle accident with a semi-truck on March 28, 2009. (R. 283). The following day, she went to the emergency room with complaints that "she just hurts all over." Id. Plaintiff complained specifically of pain in her neck, upper back, and middle back, and she rated her pain as an eight on a scale of one to ten. (R. 284). Upon examination, plaintiff had mild tenderness across her upper back and mild tenderness and spasm to her bilateral paralumbar musculature. (R. 285). Straight leg test was negative bilaterally, plaintiff had full range of motion in all joints, and plaintiff was "able to ambulate independently." (R. 285, 287). She was diagnosed with acute cervical, dorsal, and lumbar strain, although the doctor found that plaintiff's response to the exam seemed "exaggerated as the p[atien]t flinches with just a minimal touch." (R. 285).

In late April 2009, plaintiff's attorney referred her to a chiropractor. (R. 244). Plaintiff complained of neck pain, middle back pain, and lower back pain. (R. 249). After several visits to the chiropractor, plaintiff stated that she was feeling better and seeing some improvement in her

---

[1] The ALJ cited to the corresponding numbers located in the Dictionary of Occupational Titles. The assembler job carried number DOT 692.685-230 (745 jobs in Oklahoma and 54,800 jobs in the national economy); the laundry worker carried number DOT 589.685-038 (485 jobs in Oklahoma and 34,000 jobs in the national economy); and the file clerk carried number DOT 206.367-014 (3,100 jobs in Oklahoma and 241,000 jobs in the national economy.) (R. 18). The ALJ also found that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles.

pain and range of motion. (R. 250-51). Plaintiff continued to complain of soreness in her neck, shoulders, and lower back through June 2009. (R. 251-52). In July 2009, plaintiff still complained of pain, but the chiropractor released her from active care. (R. 253).

Plaintiff also sought treatment from Dr. Phillip Knight. (R.258, 260, 274-80). Dr. Knight ordered multiple MRI scans of plaintiff's spine. Other than "subtle" bulges at C3-C4 and C4-C5, the MRI scans were normal. (R. 255-57). Dr. Knight prescribed pain medication – Lortab and Soma – for plaintiff. (R. 258, 260, 307-11). Plaintiff last saw Dr. Knight in October 2009. (R. 274, 307-11).

Plaintiff also injured the third toe of her right foot in the motor vehicle accident. In June 2009, her podiatrist recommended that she have surgery for "hammertoe." (R. 267-69, 271-72, 292-94). The surgery was successful, but plaintiff continued to complain of pain in her right foot during her appointments with the chiropractor. (R. 250-52, 270). In January 2010, however, Dr. Knight reported to plaintiff's attorney that plaintiff's toe was "doing better." (R. 308).

In addition to her treating physician's records, the Commissioner also ordered physical and mental consultative examinations for plaintiff. (R. 296-301, 302-04). Plaintiff underwent the physical examination in June 2010. (R. 296). The examining physician found that plaintiff had some limited range of motion in the extension and flexion of the back, in the extension of the neck, and in the flexion of the hips. (R. 298-301). Plaintiff complained of pain in her neck and back during the examination. (R. 296-301). The examining physician found no other problems and noted that plaintiff ambulated normally. (R. 297, 300). The examining physician concluded that plaintiff had chronic cervical and thoracic/lumbar pain. (R. 297).

The examining psychiatrist met with plaintiff in August 2010. (R. 302-04). After an examination, he stated that "Bipolar disorder type 2 is a possible diagnosis" and assessed

plaintiff with a GAF score of 60. (R. 303). His impression was that plaintiff had a "history of mood swings" with "more lows than highs." Id. He noted that plaintiff had not sought any treatment for her mental health issues and stated that "[i]t would help her to get on some kind of mood stabilizer and/or anti-depressant medication." (R. 304). He concluded that her ability to work was "moderately impaired," given plaintiff's difficulty "getting along" with co-workers and supervisors. Id.

**The ALJ Hearing**

The ALJ held a hearing on July 12, 2011. Plaintiff's attorney argued that plaintiff met the listing for depression or, alternatively, that she should be found disabled at step five due to an inability to perform other work. (R. 28). Plaintiff testified that she was married but lived with her mother so that she could have help caring for her children. (R. 29). Plaintiff testified that she did not work in 2007 or 2009 and worked only a small amount in 2008 because she was taking care of her own children. (R. 33).

Plaintiff stated that she sustained injuries to her neck, back, and right foot in the automobile accident. Id. She stated that she sustained two bulging discs in her neck and underwent surgery on one toe of her right foot. (R. 34). She testified that she could not stand, sit, or lie down for long periods of time because she was "always uncomfortable" and had pain "all the time." Id. The pain radiated down into her legs, mostly into her right leg. Id. She also experienced constant neck pain and migraine headaches "[t]hree or four times a week." (R. 36). She estimated that she spent "about 80 percent of my day in the bed." Id. Her neck pain also caused her to have problems grasping and holding objects. Id.

Plaintiff estimated that she could sit or stand for thirty minutes at a time, but she also stated that she would need to lie down after one sit/stand rotation. (R. 37-38). Plaintiff testified

that she only got out of bed to "got to the bathroom, or when I have something I have to do, like, with the kids or something." (R. 38). She would occasionally leave the house to pick up a prescription or attend a parent-teacher conference, but she had no energy for any other activities. (R. 40). She believed that she could lift only ten pounds. (R. 37). Her mother did all the household chores and took care of plaintiff's children. (R. 38).

Plaintiff also described her mood swings. (R. 38-39). She testified that she "get[s] very irritated about everything" and has mood swings daily. (R. 39). She also experienced occasional crying spells. Id. Her mood swings interfered with her ability to work because her supervisors and co-workers would "tell me what to do and I just, I don't like that." (R. 39-40). She also described having difficulty with concentration, staying on task, and finishing projects. (R. 41).

Plaintiff testified that she had seen a podiatrist and surgeon for the injury to her right foot. (R. 45). She also stated that her last treatment sessions for back pain were with her chiropractor. (R. 46). Plaintiff confirmed that she last received treatment in 2009. Id. Plaintiff also stated that she last took medication in late 2009 or early 2010, when she received a prescription for Lortab for pain and Soma for a muscle relaxant. (R. 48-49). At the time of the hearing, plaintiff was not taking any medication or receiving any medical treatment.

The ALJ then took testimony from the vocational expert. The vocational expert testified that plaintiff could not perform any of her previous work if she were prohibited from having contact with the general public. (R. 50). The ALJ then proposed the following hypothetical: a claimant capable of light work with additional physical limitations of occasionally climbing, balancing, stooping, kneeling, crouching, crawling, and reaching overhead and mental limitations of simply routine, repetitive tasks with no contact with the general public. (R. 50-51). The vocational expert testified that under those circumstances, a claimant could perform other

10

work, including an assembler, a laundry worker, and a file clerk. (R. 51-52). The vocational expert gave the corresponding job numbers from the Dictionary of Occupational Titles and the estimated number of jobs available in the State of Oklahoma and nationally. Id. The vocational expert further testified that plaintiff would not be able to work if she needed to take frequent, unscheduled breaks or if she was off task due to her impairments for a significant part of the day. (R. 52).

## ANALYSIS

Plaintiff raises two points of legal error. First, plaintiff argues that the ALJ's use of boilerplate language in the residual functional capacity and credibility findings constitutes reversible error, relying on Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012). Second, plaintiff argues that the ALJ improperly relied on the vocational expert's testimony regarding other work, which contradicted the listings in the Dictionary of Occupational Titles and the ALJ's hypothetical.

**Boilerplate Language**

Plaintiff contends that the ALJ improperly relied on "boilerplate language" in assessing plaintiff's residual functional capacity and credibility. Plaintiff relies on Bjornson, a case in which the Seventh Circuit Court of Appeals heavily criticized the Commissioner's use of "templates" and "boilerplate language" in drafting ALJ decisions. See Bjornson, 671 F.3d at 645-46. Plaintiff's argument is misplaced.

As an initial matter, this Court is not bound by Seventh Circuit precedent; therefore, Bjornson, while it may be persuasive, is not binding on this Court. Second, while the Seventh Circuit stated that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates,'" the decision to reverse and remand Bjornson for further

proceedings did not turn on the use of boilerplate language and templates. Id. at 646. The Seventh Circuit remanded Bjornson because it found that the ALJ mischaracterized the medical evidence. See id. at 646-49.

Plaintiff does correctly state that the Tenth Circuit, whose opinions are binding on this Court, also disfavors boilerplate language. In addition to the general requirement that an ALJ's decision be supported by substantial evidence, the Tenth Circuit requires ALJs to make credibility findings that are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). Boilerplate language "is insufficient, *in the absence of a more thorough analysis*, to support an ALJ's credibility determination as required by Kepler." Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004) (emphasis added) (citing Angel v. Barnhart, 329 F.3d 1208, 1213 (10th Cir. 2003)). Accordingly, if the ALJ's decision is supported by specific reasons, it may be affirmed, despite the use of boilerplate language in the ALJ's decision.

In this case, the ALJ carefully reviewed all of the medical evidence, as well as plaintiff's testimony. The ALJ cited, in great detail, plaintiff's course of treatment following her automobile accident in March 2009, including her chiropractic care, pain management care, and surgical care. (R. 14-16). The ALJ noted that plaintiff had been released from treatment after reaching maximum medical benefit with limitations in her range of motion and some pain. (R. 15-16). The ALJ also relied on the consultative examining physician's report, which was consistent with the treatment notes from plaintiff's treating physician. (R. 16). With respect to plaintiff's mental health limitations, the ALJ adopted the findings of the consultative examining psychiatrist, whose report constituted the only medical evidence of plaintiff's mental issues. Id. The ALJ also accepted, in part, plaintiff's own complaints about her difficulties interacting with others. (R. 13-

14, 16). After reviewing all of this medical evidence, the ALJ concluded that plaintiff retained the residual functional capacity to perform "less than the full range of light work" due to both physical and mental limitations. (R. 13). In reaching this conclusion, the ALJ rejected the opinions of the agency physicians, which found that plaintiff could perform medium work, and found that plaintiff was more limited in her ability to work. (R. 17). The ALJ did adopt the limitations recommended by the agency psychologists, finding them consistent with the consultative examination and the record as a whole.

The ALJ also considered plaintiff's subjective complaints regarding her limited daily activities, pain levels, and ability to work. (R. 13-14). The ALJ accepted plaintiff's statements regarding her mental limitations and included them in his residual functional capacity findings. (R. 13, 16-17). The ALJ did reject, at least in part, plaintiff's testimony about her physical abilities because nothing in the medical record supported plaintiff's testimony that she needed to spend 80% of her day in bed. (R. 14). The ALJ also noted that plaintiff stopped receiving treatment in late 2009 and only took over-the-counter medications. Id.

The structure of the ALJ's opinion supports both the residual functional capacity finding and the credibility determination. The ALJ first recited plaintiff's testimony, which included her subjective complaints and her own opinion of her physical and mental limitations. (R. 13-14). The ALJ then concluded that plaintiff's testimony was not entirely credible. (R. 14). Admittedly, the ALJ used boilerplate language when stating his conclusion. The use of boilerplate language in this case is not reversible error, however, because the ALJ then supported his conclusion with objective medical evidence. (R. 14-17). The ALJ noted those medical records that contradicted plaintiff's testimony. For example, the ALJ cited emergency room records that found plaintiff's "[r]esponse to the examination seemed exaggerated as she flinched with just a minimal touch."

(R. 14). The ALJ also cited to negative tests at the emergency room and during the consultative examination, as well as plaintiff's unremarkable MRI scans. (R. 14, 15, 16). Further, the ALJ explained plaintiff's progress during treatment, noting her successful toe surgery, her improvement through chiropractic treatment, and her treating physician's decision to release her from care. (R. 14-16). Each of these facts contradicts plaintiff's testimony that she needed to spend 80% of her day in bed and that she could not work due to pain.

While the ALJ's decision could have more closely linked the evidence to his credibility determination, the structure of the decision is sufficient to support the ALJ's findings. Since the issuance of the Kepler and Hardman decisions, the Tenth Circuit has affirmed the denial of benefits based upon the structure of an ALJ's written decision. In Sanders v. Astrue, 266 Fed.Appx 767, 770-71 (10th Cir. 2008) (unpublished),[2] the Tenth Circuit found that the ALJ adequately explained his credibility findings, despite the use of boilerplate language, where the ALJ "supported his ultimate credibility determination with specific evidence from the record." The Court held that "[w]here 'the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of Kepler are satisfied.'" Id. at 770 (quoting Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000)). The Tenth Circuit recently reached a similar conclusion regarding an ALJ's treating physician's opinion analysis. See Mayberry v. Astrue, 461 Fed.Appx. 705, 708-09 (10th Cir. 2012) (holding that the ALJ's conclusion "borders on improper boilerplate language" but was sufficient to support the ALJ's decision because the ALJ cited with specificity the "inconsistencies between [the treating physician's] opinions and her treatment records.").

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

For these reasons, the ALJ's findings are sufficiently specific and adequately supported by substantial evidence in the record.[3] Even though the ALJ did use the disfavored boilerplate language regarding plaintiff's residual functional capacity and credibility, the ALJ's decision clearly is based on specific evidence in the record and meets the requirements of Kepler and Hardman.

**Other Work**

Plaintiff next argues that the ALJ improperly relied on the vocational expert's testimony in finding that plaintiff could perform other work. First, plaintiff argues that the vocational expert's testimony that plaintiff could work as an assembler or laundry worker is not consistent with the Dictionary of Occupational Titles because the job numbers do not match the job titles. Second, plaintiff argues that all three of the representative jobs cited by the vocational expert require plaintiff to have contact with the general public, a requirement that conflicts with the ALJ's residual functional capacity findings. The Commissioner agrees that the job titles in the Dictionary of Occupational Titles vary from the vocational expert's testimony regarding the job titles; however, the Commissioner argues that the substance of the job description matching the job numbers is consistent with the vocational expert's characterization of the assembler and laundry worker jobs.

The Occupational Information Network (O*NET) defines assembler jobs in part as follows: "Assemble or fit together parts to form complete units or subassemblies at a bench, conveyor line, or on the floor. Work may involve the use of handtools, power tools, and special equipment in order to carry out fitting and assembly operations." See

---

[3] The undersigned agrees with the Commissioner that plaintiff has not raised any specific challenges to the substance of the ALJ's findings regarding plaintiff's residual functional capacity and her credibility. This holding is intended to relate only to plaintiff's challenge that the ALJ relied on boilerplate language and made no specific findings on these issues.

http://www.occupationalinfo.org/onet/93956.html (last visited on December 20, 2012). Tasks associated with this job include "fasten[ing] component parts of assembly together, using hand tools, power tools, or bench machines;" "hold[ing] parts during assembly, using hands, clamps, pneumatic screw presses, or other work aides;" and "fil[ing], grind[ing], plan[ing], sand[ing], or buff[ing] parts to remove burrs, alter shape, improve fit, or smooth finish, using hand tools or power tools." See http://www.occupationalinfo.org/onet/93956.html#TASKS (last visited on December 20, 2012). The job description for a "trim cutter," the assembler job cited by the ALJ, is defined as

> Tends machine that applies metal binding to protect and decorate edges of wooden level bodies: Inserts strips of metal trim in vertical slots of machine. Stands level body on end under loaded slots and closes gate to lock level in place. Starts ram that forces metal corner strips into grooves in wooden body of level. Examines trimmed levels to detect split or splintered wood, or scratches and dents in metal binding. May install metal end plates on level bodies, using drill press and power screwdriver.

This job description is consistent with the broader definition of "assembler;" therefore, the undersigned finds no conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.

Similarly, the general description of a laundry worker in O*NET is consistent with the job number cited by the vocational expert. O*NET defines the job of "Laundry and Drycleaning Machine Operators and Tenders, Except Pressing" as one in which a person "Operate[s] or tend[s] washing or dry-cleaning machines to wash or dry-clean commercial, industrial, or household articles, such as cloth garments, suede, leather, furs, blankets, draperies, fine linens, rugs, and carpets." See http://www.occupationalinfo.org/onet/92726.html (last visited on December 20, 2012). The dry cleaner position cited by the vocational expert is a position in which a person

16

> Tends cleaning machine and drier that clean and dry knitted garments: Examines garment for soil and determines type of soil. Lays garment on cleaning board with spotted surface exposed. Applies soap solvent to spot with brush and removes excess soap with towel. Opens valve to admit cleaning fluid to tank of washing machine. Lays spotted garment in machine and starts machine. Stops machine after specified time, and removes and places garment in drier. Removes garment from drier and hangs garment on hook in clothes room. Turns fan on in clothes room to drive cleaning fluid fumes from clothes. Removes garment from clothes room.

See http://www.occupationalinfo.org/58/589685038.html (last visited on December 20, 2012). The definitions of these two jobs are nearly identical; therefore, the undersigned finds no conflict between the vocational expert's testimony and the Dictionary of Occupational Titles.

Finally, plaintiff argues that all three of the jobs cited, particularly the file clerk job, require plaintiff to have contact with people in a manner that violates the ALJ's finding that plaintiff not have contact with the general public. After reviewing O*NET's detailed descriptions of the skills and work activities associated with the jobs of assembler, laundry worker, and file clerk, the undersigned finds that these jobs do not violate the ALJ's restriction that plaintiff not have contact with the general public. An assembler is not required to communicate with anyone, either co-workers, supervisors, or the general public. See http://www.occupationalinfo.org/onet/93956.html#SKILLS (last visited on December 20, 2012). A laundry worker must communicate with "supervisors, fellow workers, and subordinates," but not with the general public. See http://www.occupationalinfo.org/onet/92726.html#SKILLS (last visited on December 20, 2012).[4] Likewise, a file clerk's interaction with another person is fairly limited, and contact with the general public is not a job requirement. See

---

[4] Communicating with co-workers and supervisors is ranked relatively high (50) on the list of work activities associated with the laundry worker job. Interaction with the public is ranked extremely low on the list (10). See http://www.occupationalinfo.org/onet/92726.html#SKILLS (last visited on December 20, 2012). For this reason, the undersigned concludes that contact with the general public is not a job requirement for a laundry worker.

17

http://www.occupationalinfo.org/onet/55321.html#SKILLS (last visited on December 20, 2012).[5]

## RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the District Court **AFFIRM** the ALJ's decision denying plaintiff's claims for benefits.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by January 7, 2013.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

---

[5] Communicating with co-workers and supervisors rates only a 35 in importance. "Communicating With Persons Outside Organization" ranks even lower in importance (21). See http://www.occupationalinfo.org/onet/55321.html#SKILLS (last visited on December 20, 2012). For this reason, the undersigned concludes that contact with the general public is not a job requirement for a laundry worker.

18

SUBMITTED this 22nd day of December, 2012.

_____
T. Lane Wilson
United States Magistrate Judge