**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MICKEY ANN LIVEOAK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-0678-CVE-TLW** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Before the Court is the magistrate judge's report and recommendation (Dkt. # 18) recommending that the Court affirm the Commissioner of the Social Security Administration's decision to deny plaintiff Mickey Ann Liveoak's claims for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. Plaintiff has filed an objection to the report and recommendation, seeking a remand of the case for further administrative proceedings. Dkt. # 19. Defendant has not responded to plaintiff's objection, and the time to respond has expired.

**I.**

On May 6, 2010, plaintiff filed an application for SSI and an application for DIB, both alleging an onset date of March 28, 2009. Dkt. # 14-5, at 4-12. Plaintiff was 29 years old at the time of her applications, and she claimed that she was disabled because of injuries she sustained in a motor vehicle accident, including pain in her back, neck, and right foot, headaches, problems with her arms and hands, and depression. Dkt. # 14-6, at 46. Plaintiff's claims were initially denied in September 2010, and on reconsideration in October 2010. Dkt. # 14-3, at 3-8; Dkt. # 14-4, at 2-10,

14-19. Plaintiff requested a hearing before an administrative law judge (ALJ) (Dkt. # 14-4, at 20-22), and a hearing was set for July 12, 2011. Id. at 20-26.

According to plaintiff's medical records, plaintiff was involved in an automobile accident on March 28, 2009. Dkt. # 14-7, at 41. She went to the emergency room the following day, and stated that her symptoms were "moderate," but the emergency room records reflect that her "[r]esponse to [the] exam seemed exaggerated as the [plaintiff] flinche[d] with just a minimal touch." Id. at 41-43. In April 2009, plaintiff, upon referral by her attorney, saw a chiropractor. Id. at 2. Plaintiff complained of dizziness, headaches, difficulty sleeping, pain her neck, jaw problems, chest pain, shortness of breath, and pain in her back. Id. at 5. After multiple visits in April and May, plaintiff reported that she was "doing better," but she continued to have pain. Id. at 9-11.

Plaintiff also injured her "right third toe" in the accident, and she was diagnosed with "hammertoe." Id. at 20-21, 25. Plaintiff originally saw M. Derek Smith, D.P.M., regarding her foot pain, but he told plaintiff that she may need surgery to correct her hammertoe. Id. at 50. David M. Sparks, M.D., performed the surgery on plaintiff's toe, and, in a follow-up examination, noted that he thought plaintiff "is going to do well." Id. at 25-28. Additionally, plaintiff saw Phillip Knight, M.D., complaining of pain in her neck, back, and foot. Id. at 13. Dr. Knight referred plaintiff for an magnetic resonance imaging (MRI) of her cervical spine, which revealed "[u]nremarkable cervical spine[,] [and] [s]ubtle disc bulges are present at C3-C4 to C-C5," but "no disc herniation or protusion." Id. Similarly, MRIs of plaintiff's thoracic and lumbar spines were "[u]nremarkable." Id. at 14-15. Dr. Knight prescribed Soma and Lortab. Id. at 18. On October 23, 2009, Dr. Knight found that plaintiff had reached "maximum medical benefit," and he released plaintiff from treatment. Id. at 66. Dr. Knight opined that plaintiff had 25 percent "permanent impairment for loss

of range of motion to the right foot/first and third right toes, with pain, sensory loss, and loss of strength," but that plaintiff sustained only a two percent "permanent whole man impairment for loss of range of motion to the neck" and back. Id. at 67-69.

Administrative law judge Larry D. Shepherd (ALJ) ordered physical and mental consultative examinations. Id. at 53-64. In a physical consultative examination of plaintiff, Brad Liston, D.O., found that plaintiff moved all extremities well and that she was able to pick up and manipulate paperclips without difficulty. Id. at 55. Alzira F. Vaidya, M.D., performed a mental consultative examination. Id. at 62. Dr. Vaidya noted that "[b]ipolar disorder type 2 is a possible diagnosis," and that plaintiff experienced "highs and lows" and "suicidal thoughts." Id. Dr. Vaidya also concluded that plaintiff's ability to work was moderately impaired. Id. Cynthia Kampschaefer, Psy. D., completed a psychiatric review technique form, and found that plaintiff had moderate restrictions in her activities of daily living and one to two episodes of decompensation, each of extended duration. Id. at 80. Dr. Kampschaefer found plaintiff could not relate to the general public but that she could relate to supervisors on a superficial basis. Id. at 86. Walter W. Bell, M.D., completed a physical residual functional capacity assessment, and found plaintiff's objective examinations did not support plaintiff's alleged limitations. Id. at 88-89. On review, both the physical and mental state agency assessments were affirmed. Id. at 96-97.

On July 12, 2011, the ALJ held a hearing, at which plaintiff was represented by counsel. Dkt. # 14-2, at 27. Plaintiff testified that she was married, had two children, and lived with her mother. Id. at 30-31. Plaintiff did not complete high school because she "got pregnant," but she "did some college." Id. at 31-32. Plaintiff stated that she made "As and Bs" in high school, and she did not have any problems reading or writing and could do basic math. Id. at 32-33. Regarding

her work history, plaintiff testified that she worked for "[n]ot even a day" in 2010 at a "[h]ome health-type" job. Id. at 33. The ALJ confirmed that plaintiff was in an automobile accident on March 28, 2009, and that plaintiff had not worked from 2007 through the time of her accident, which plaintiff stated was because she was caring for her children. Id. at 33-34.

Plaintiff confirmed that, as a result of the automobile accident, she sustained an injury to her back, neck, and right foot, and that a MRI of her neck revealed "two bulging discs." Id. at 34-35. Plaintiff also confirmed that she had surgery on her foot for "hammertoe." Id. at 35. Plaintiff testified that she had problems with her foot after the surgery, and that she also had problems with her low back. Id. Plaintiff stated that "[s]tanding up for long periods of time," sitting down, or even laying down, would make her uncomfortable, and that she was "not comfortable no matter what" she did. Id. Plaintiff testified that she could only sit or stand, if she could trade between the two, for about an hour before she would need to recline, and she has trouble picking things up. Id. at 35-39. Regarding the accident, plaintiff confirmed that she was "hit by a semi," and her car was "totaled." Id. at 36. Plaintiff stated that she had "migraine headaches since the wreck" "[t]hree or four times a week," which last "[a] day or so." Id. at 36-37. Plaintiff testified that she spends "about 80 percent of [her] day in the bed." Id. at 37.

Plaintiff confirmed that she lived with her mother, and that her mother does plaintiff's hair, cleans the house, and "everything else," including sitting with the kids. Id. at 38-39. Plaintiff testified that her mother takes care of plaintiff's children, but that the children "help out" around the house. Id. at 42-43. Plaintiff stated that she has trouble sleeping because the pain keeps her from being comfortable, and she wakes up "[e]very hour or so," and plaintiff also testified to limited daily activities. Plaintiff stated that, from the time she wakes up, she "[p]retty much lay[s] in the bed,"

and if she has to go to the bathroom, her mother will assist her in taking a shower. Id. at 43. Plaintiff stated that she sits down on a chair while she showers, and that her mother washes her hair. Id. at 44. Plaintiff testified that the television "kills" her head, and reiterated that she spends "[a]bout 80 percent" of her day in bed, and, if she does not, she "would get these killer headaches." Id. at 43-44. She further stated that she could not perform several household chores, including cooking. Id. at 47-48.

Plaintiff stated that she saw Dr. Vaidya for a psychiatric evaluation, and that she has trouble with mood swings. Id. at 38-39. Plaintiff clarified that she "just get[s] very irritated about everything" and that her mood swings do not have anything to do with the pain. Id. at 40. Plaintiff stated that she had suicidal thoughts "in the past," and that she had crying spells "[o]nce in awhile." Id. Plaintiff testified that she had trouble "getting along with people," including supervisors and co-workers, at her prior jobs because they told her what to do, and she did not like that. Id. Plaintiff stated that she had "no friends," and that she leaves the house when she has to, but that her mother accompanies her. Id. at 41. Plaintiff confirmed that she told Dr. Vaidya that she "heard a man's voice telling [her] things," but that she had not heard it "in awhile." Id. at 42. Plaintiff also confirmed that she did not have "any trouble with anxiety, panic attacks, things like that," except crying. Id. She stated that she has trouble concentrating and finishing things, including puzzles with her children. Id.

Plaintiff stated that she did not have a treating physician because she did not have insurance. Id. at 45. Plaintiff further stated that she had never seen a psychologist, psychiatrist, counselor, or "anything along those lines," other than the consultative examination. Id. at 46. Plaintiff testified that she saw Dr. Smith for treatment for "a long time," but that Dr. Sparks performed the surgery

on her foot. Id. The ALJ reviewed plaintiff's medical records with her, and plaintiff confirmed that the last time she saw a doctor regarding her back was in 2009. Id. at 46-47. Plaintiff stated she was prescribed Lortab for pain and Soma for "[m]uscles." Id. at 48-50.

The ALJ called vocational expert (VE) David Couch to testify about the requirements of plaintiff's past work and the availability of jobs in the marketplace that could be performed by a person with plaintiff's limitations. Id. at 50-51. Plaintiff's counsel had no objections to the VE's qualifications. Id. at 51. The ALJ asked a hypothetical question based on plaintiff's age, education, and physical and mental abilities, which included a limitation that plaintiff "have no contact with the general public." Id. at 51-52. The VE testified that plaintiff could perform three jobs, including the work of an assembler, Dictionary of Occupational Titles (DOT) number 692.685-230, which had 54,800 jobs in the national economy, and 745 in the state economy. Id. at 52. The VE stated that the second position would be a laundry worker, DOT number 589.685-038, which had 485 jobs in the state economy and 34,000 in the national economy. Id. at 52-53. The VE testified that the final position was that of a file clerk, DOT number 206.367-014, which had 3,100 jobs in the state economy and 241,000 in the national economy. Id. at 53. The ALJ asked whether, assuming additional limitations, including that the person would be "required to take frequent, unscheduled breaks in excess of normally allotted breaks," the individual could perform all of the above jobs. Id. The VE testified that the additional limitations would "preclude that hypothetical individual from working in all jobs," and that his responses were "consistent with the [D]ictionary of [O]ccupational [T]itles." Id.

On August 13, 2011, the ALJ issued a written decision denying plaintiff's claims for SSI and DIB. Dkt. # 14-2, at 10. The ALJ found that plaintiff had not "been under a disability within the meaning of the Social Security Act from March 28, 2009 through the date of [his] decision." Id. The ALJ determined that plaintiff had the following severe impairments: "status post back and neck injuries from motor vehicle accident and affective mood disorder." Id. at 12. The ALJ noted that plaintiff "also allege[d] an inability to work due to headaches." Id. However, the ALJ found that "[t]here is no evidence of evaluation or regular and ongoing treatment for such condition." Id. at 12-13. The ALJ further noted that plaintiff "told the consultative examining physician that she takes Tylenol over-the-counter medication." Id. at 13. The ALJ found that plaintiff's headaches were a "nonsevere" impairment, which he defined as "a slight abnormality or combination of slight abnormalities that has no more than a minimal effect on the ability to do basic work activities." Id. The ALJ found that plaintiff does not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments." Id. To make this finding, the ALJ considered plaintiff's "back and neck impairment under Listing 1.04 A," but the ALJ found that plaintiff "does not have nerve root compression . . . as required by Listing 1.04 A." Id.

The ALJ also found that "[t]he severity of [ ] [plaintiff's] mental impairment does not meet or medically equal the criteria of listing 12.04." Id. To make this finding, the ALJ considered "paragraph B" criteria. Id. The ALJ noted that a mental impairment, to satisfy "paragraph B" criteria, must result in at least two of the following: "marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." Dkt. # 14-2, at 13. Because plaintiff lived with her mother, who helped with the cooking, cleaning, and shopping, and because plaintiff did not

leave the house often, but took care of a dog and her own personal needs, the ALJ found that plaintiff had a moderate restriction in her daily living activities. Dkt. # 14-2, at 13. Second, the ALJ found that plaintiff had moderate difficulties with both social function and "concentration, persistence, or pace." Id. Again, the ALJ recounted plaintiff's daily activities and added that, "[a]t the mental status examination, her memory seemed to be intact." Id. Finally, the ALJ noted that plaintiff had "experienced one to two episodes of decompensation, each of extended duration." Id. at 14. Thus, the ALJ found that, since plaintiff did not have at least two of the limitations required, the "paragraph B" criteria were not satisfied. Id. The ALJ considered whether "paragraph C" criteria were satisfied, but determined that plaintiff's mental impairments did not meet the criteria. Id. The ALJ found, "[a]fter careful consideration of the entire record," that plaintiff

> has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The [plaintiff] has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. The [plaintiff] can sit for about 6 hours during an eight-hour workday and can stand and walk for about 6 hours during an eight-hour workday. The [plaintiff] can occasionally climb, balance, stoop, kneel, crouch, and crawl. The [plaintiff] can occasionally reach overhead. The [plaintiff] can understand, remember, and carry out simple, routine, and repetitive tasks. The [plaintiff] can respond appropriately to supervisors, co-workers, and usual work situations, but have no contact with the general public.

Id. The ALJ noted that he had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "opinion evidence." Id.

To make the RFC finding, the ALJ followed a two-step process. Id. at 14. First, the ALJ determined "whether there is an underlying medically determinable physical or mental impairment[ ] . . . that could reasonably be expected to produce the [plaintiff's] pain or other symptoms." Id. Second, the ALJ evaluated "the intensity, persistence, and limiting effects of the [plaintiff's]

symptoms to determine the extent to which they limit the [plaintiff's] functioning." Id. To make this finding, the ALJ considered objective medical evidence and made a credibility finding regarding any statements that were not "substantiated by objective medical evidence." Id. at 14-15.

The ALJ summarized plaintiff's testimony from the hearing. Id. at 15. The ALJ included plaintiff's testimony regarding injuries she sustained in the automobile accident, including migraine headaches three to four times per week for a day or so each time. Id. at 15. Additionally, the ALJ included plaintiff's testimony about her limited daily activities. Id. After considering plaintiff's testimony, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id.

The ALJ thereafter reviewed the medical evidence of plaintiff's impairments. Id. The ALJ noted that plaintiff went to the emergency department, on March 29, 2009, because of pain in her neck and upper and middle back. Id. The ALJ stated that plaintiff's "symptoms came on gradually and became progressively worse from a motor vehicle collision that occurred the previous day." Id. A physical examination of plaintiff revealed "mild spasm of the paracervical musculature bilaterally with exaggerated tenderness to palpation." Id. Further, an examination of plaintiff's back revealed "mild tenderness to palpation." Id. However, the ALJ noted that plaintiff's medical records revealed that plaintiff's "[r]esponse to the examination seemed exaggerated as she flinched with just a minimal touch." Id. Plaintiff also complained "of severe pain to the low back with minimal touching of the top of the head." Id. The ALJ reviewed the results of the emergency room examination, and noted that plaintiff "had no significant traumatic injuries or tenderness of the

extremities." Id. at 15-16. Plaintiff was prescribed "Ibuprofen, Tramadol and Diazepam." Id. at 16. Further, an MRI of plaintiff's cervical spine was "unremarkable." Id. The ALJ stated that "[s]ubtle disc bulges were present at C3/C4 to C4/C5[,] [but] there was no disc herniation or protusion." Id. Similarly, MRIs of plaintiff's thoracic spine and lumbar spine were both "unremarkable." Id.

The ALJ noted that plaintiff was seen by Dr. Smith on June 5, 2009 for a hammertoe deformity. Id. Plaintiff "had injured the toe in the motor vehicle accident, and it had worsened over time." Id. An examination and x-rays of plaintiff's toe revealed "contractures" and "bony irregularity." Id. The ALJ noted that plaintiff's medical records revealed that she "was advised of the need to decrease activity," but that the records also revealed that plaintiff "may ambulate for necessities of work, otherwise rest and elevate; mild activity only to facilitate improvement and healing." Id. Plaintiff was referred to Dr. Sparks for the hammertoe injury. Id. On June 18, 2009, plaintiff was examined, and the examination revealed that plaintiff had pain in her toe, and she was unable to extend it. Id. On June 29, 2009, plaintiff underwent surgery to correct her hammertoe. Id. At a follow-up examination, the ALJ noted that plaintiff's "wound looked fine, and her toe position was good." Id.

The ALJ also reviewed plaintiff's medical records from Dr. Phillip J. Knight. Id. Plaintiff was initially seen on April 27, 2009, with follow-up visits in May, June, July, and October 2009. Id. At the initial evaluation, plaintiff complained "of headaches in the frontal and occipital areas, as well as complaints to the neck, thoracic spine, lumbar spine and right toes." Id. Plaintiff "participated in chiropractic treatment" and "was given Lortab for pain and Soma, a muscle relaxant." Id. Plaintiff also received injections. Id. At a subsequent examination, plaintiff

continued to complain of neck and low back pain as well as headaches, although her headaches "had diminished in severity." Id. Plaintiff received referrals to a podiatrist and an orthopedist, was prescribed Lortab and Soma, and was given injections of Toradol and B-12, which "seemed to help." Id. The ALJ noted that "[o]n October 23, 2009, the [plaintiff] was found to have reached maximum medical benefit and was released from Dr. Knight's care. She was given a final refill of Lortab and Soma to use as needed and was told to follow up with her regular treating physician." Id. Additionally, the ALJ reviewed the results of the evaluation on the day she was released. Id. at 16-17. The ALJ stated that Dr. Knight's report reflected that plaintiff, as a result of her automobile accident, "had sustained cervical, lumbar somatic dysfunction and right first and third toe contusions with surgery." Id. at 17.

The ALJ thereafter reviewed plaintiff's consultative examination with Dr. Liston on June 24, 2010. Id. The ALJ noted that plaintiff stated that "[s]he was not currently seeking medical treatment for the pain" and that "[s]he was only taking Tylenol over-the-counter medication." Id. The ALJ reviewed the results of plaintiff's physical examination, including that plaintiff "was able to pick up and manipulate paper clips without difficulty," "moved about [the] exam room easily," and "ambulated with a stable gait at an appropriate speed without use of assistive devices." Id.

The ALJ also reviewed the results of plaintiff's psychiatric consultative examination with Dr. Vaidya. Id. The ALJ noted that plaintiff "drove herself to the appointment," and that she "reported that her life changed after she was hit by a semi and 'v-boned' in March of last year." Id. The ALJ stated that plaintiff "constantly hurt," and that taking care of her dog is her only hobby. Id. Further, the ALJ reviewed plaintiff's statements, including that "[h]er mom lives with her and helps her," "she [does] not get out at all unless she ha[s] to," and "[s]he [ ] did not get along with

family members even before the accident." Id. The ALJ also stated that plaintiff reported that "[s]he did not have a definitive suicidal plan." Id.

The ALJ discussed plaintiff's work history. The ALJ stated that plaintiff's last job "was at the American Legion Children's Home," and that she worked there for "about a year in 2007 taking care of the girls or patients there," which included "making sure they did their homework, cooking for them, taking them to doctors' appointments, and getting them up in the morning for school." Id. The ALJ noted that plaintiff was fired from that job because "she apparently took a vacation when they asked her not to, although it was planned before." Id. Prior to her work at the American Legion Children's Home, plaintiff worked at Burger King for over two years, but she quit that job because she was pregnant; however, in both positions, plaintiff "had trouble getting along with co-workers and supervisors." Id. at 17-18.

The ALJ noted the results of plaintiff's mental status examination. Id. at 18. He stated that plaintiff reported she "stayed in bed a lot, had headaches, did not sleep well, was happy one minute and angry the next." Id. The ALJ "considered the opinions of the State Agency medical consultants who evaluated the evidence in the record at the initial and reconsideration levels of the administrative review process" and found that plaintiff "retained the capacity to perform medium work." Id. The ALJ found, however, that plaintiff's "impairments are more limiting and limit her to less than the full range of light work." Id. The ALJ stated that he interpreted the medical evidence differently, but that he generally agreed with the "agency medical consultants that the [plaintiff's] impairments are not disabling." Id.

The state agency psychologists opined that plaintiff "can perform simple tasks with routine supervision; can relate to supervisors and peers on a superficial work basis; cannot relate to the general public; and can adapt to a work situation." Id. The ALJ gave the psychologists' opinions "great weight" because the opinions were "well supported by medically acceptable clinical and laboratory findings, and are consistent with the record when viewed in its entirety." Id.

The ALJ found that plaintiff was unable to perform any past relevant work (PRW) because the demands of plaintiff's PRW exceeded plaintiff's RFC since each previous job "required contact with the general public." Id. The ALJ noted that transferability of job skills was not material to the determination, and he found that "[c]onsidering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform." Id. at 19. The ALJ noted the VE's testimony regarding jobs plaintiff could perform, including assembler, laundry worker, and file clerk, and he noted the DOT number as well as the number of jobs existing in the state and national economy for each position. Id. The ALJ "determined that the vocational expert's testimony [was] consistent with the information contained in the Dictionary of Occupational Titles." Id. Further, the ALJ found that, based upon the testimony of the VE, plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. Therefore, the ALJ found plaintiff was not disabled. Id. at 19-20.

Plaintiff appealed the ALJ's decision, and the appeal was denied. Dkt. # 14-2, at 2-9. Plaintiff filed this case seeking judicial review of the Commissioner's denial of her request for SSI and DIB, and her opening brief asserted two arguments. Dkt. # 15. First, plaintiff argued that the ALJ's RFC assessment was prima facie error pursuant to Bjornson v. Astrue, 671 F.3d 640 (7th Cir.

2012). Id. at 3. Second, plaintiff alleged that, at step five, the ALJ's decision failed because substantial evidence did not support the ALJ's findings. Id. at 7. More specifically, plaintiff argued that inconsistencies between the VE's testimony and information contained in the DOT meant that the ALJ's findings were necessarily not supported by substantial evidence. Id. at 7-10. The matter was referred to a magistrate judge for a report and recommendation, and the magistrate judge recommended that the Commissioner's decision be affirmed. Dkt. # 18. Plaintiff objected to the magistrate judge's report and recommendation on two grounds. Dkt. # 19. Plaintiff first argued that the magistrate judge erred in finding the ALJ's use of boilerplate language to evaluate plaintiff's credibility was not reversible error. Id. at 1-2. Second, plaintiff argued that the magistrate judge erred in finding that a conflict between the DOT job titles and the VE testimony was not reversible error. Id. at 2-5.

**II.**

Without consent of the parties, a court may refer any pretrial matter dispositive of a claim to a magistrate judge for a report and recommendation. However, the parties may object to the magistrate judge's recommendation within 14 days of service of the recommendation. Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 975 (10th Cir. 2002); Vega v. Suthers, 195 F.3d 573, 579 (10th Cir. 1999). The Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Court may accept, reject, or modify the report and recommendation of the magistrate judge in whole or in part. Fed. R. Civ. P. 72(b).

**III.**

The Social Security Administration has established a five-step process to review claims for disability benefits. See 20 C.F.R. § 404.1520. The Tenth Circuit has outlined the five step process:

> Step one requires the agency to determine whether a claimant is "presently engaged in substantial gainful activity." [*Allen v. Barnhardt*, 357 F.3d 1140, 1142 (10th Cir. 2004)]. If not, the agency proceeds to consider, at step two, whether a claimant has "a medically severe impairment or impairments." *Id.* An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 404.1521. At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation." *Allen*, 357 F.3d at 1142. If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work. *See id.* Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy. *See id.*

Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ decided this case at step five of the analysis. At step five, the ALJ must consider a claimant's RFC, age, education, and work experience to determine if other work exists that a claimant is able to perform. Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988). If the claimant can adjust to work outside of her past relevant work, the ALJ shall enter a finding that the claimant is not disabled. 42 U.S.C. § 423(d)(2)(A). However, the ALJ must find that a claimant is disabled if insufficient work exists in the national economy for an individual with claimant's RFC. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010). The Commissioner bears the burden to present sufficient evidence to support a finding of not disabled at step five of the review process. Emory v. Sullivan, 936 F.2d 1092, 1094 (10th Cir. 1991).

If there is substantial evidence to support the Commissioner's finding, then the Commissioner's decision is final. Richardson v. Perales, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)). More specifically, simply because the ALJ could have drawn "two inconsistent conclusions from the evidence" does not conclusively show the ALJ's decision is not supported by substantial evidence. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). A court shall not displace an ALJ's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id. It is not this Court's job to reweigh the evidence but only to consider the sufficiency of the evidence. Oldham v. Astrue, 509 F.3d 1254, 1257 (10th Cir. 2007).

The ALJ issued a written decision that was reviewed by the Appeals Council, which is a final decision by an administrative agency. Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008). The Court may not reweigh the evidence or substitute its judgment for that of the ALJ but, instead, reviews the record to determine if the ALJ applied the correct legal standard and if his decision is supported by substantial evidence. Id. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court must meticulously examine the record as a whole and consider any evidence that detracts from the Commissioner's decision. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).

**A.**

Plaintiff's first objection is that the magistrate judge erred in finding that the use of boilerplate language regarding plaintiff's credibility was not improper.[1] Dkt. # 19, at 1. More specifically, plaintiff argues that the Seventh Circuit case of Bjornson requires remand where an ALJ uses boilerplate language to find that a plaintiff is not credible. The magistrate judge first noted that, "[a]s an initial matter, this Court is not bound by Seventh Circuit precedent." Dkt. # 18, at 11. The magistrate judge also noted that the decision to reverse and remand in Bjornson "did not turn on the use of boilerplate language and templates." Id. at 11-12 (citing Bjornson, 671 F.3d at 646-49). The magistrate judge thereafter reviewed the ALJ's decision, including the thorough review of plaintiff's medical records and the ALJ's consideration of plaintiff's subjective complaints. Dkt. # 18, at 12-14. The magistrate judge noted that "the ALJ's decision could have more closely linked the evidence to his credibility determination," but found that "the structure of the decision is sufficient to support the ALJ's findings." Id. at 14. The magistrate judge therefore found that the ALJ's findings were "sufficiently specific and adequately supported by substantial evidence in the record," and that, "[e]ven though the ALJ did use the disfavored boilerplate language regarding plaintiff's residual functional capacity and credibility, the ALJ's decision is clearly based on specific evidence

---

[1] The magistrate judge found that plaintiff had not raised any specific challenges to the substance of the ALJ's findings regarding plaintiff's RFC and her credibility. The magistrate judge stated that his findings related "only to plaintiff's challenge that the ALJ relied on boilerplate language and made no specific finding on these issues." Dkt. # 18, at 15 n.3. Similarly, plaintiff, in her objection to the report and recommendation, does not raise any objection to magistrate judge's limiting his review to the ALJ's use of boilerplate language. Dkt. # 19. Therefore, this Court's review is limited to the ALJ's use of boilerplate language, and the Court will not make findings regarding the substance of the ALJ's credibility findings.

in the record and meets the requirements of [Kepler v. Chater, 68 F.3d 387 (10th Cir. 1995)] and [Hardman v. Barnhart, 362 F.3d 676 (10th Cir. 2004)]. Id. at 15.

In addition to citing the Seventh Circuit Bjornson case, plaintiff argues that the Tenth Circuit has also "roundly and severely criticized" the use of the boilerplate language regarding a credibility determination.[2] Dkt. # 15, at 4. "Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." Kepler, 68 F.3d at 391 (quotation and internal quotation marks omitted). "However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (internal quotation marks omitted) (citations omitted). The ALJ is not required to specifically state that he finds a certain statement credible or not credible. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1169 (10th Cir. 2012). But, boilerplate language "is insufficient, in the absence of a more thorough analysis, to support an ALJ's credibility determination as required by *Kepler*." Hardman, 362 F.3d at 679 (10th Cir. 2004) (citation omitted). Where an ALJ "simply recited [ ] factors, then concluded [plaintiff's] allegations were not credible," such a finding was a "conclusion in the guise of findings rejected in *Kepler* and many cases since." Id. (internal quotation marks omitted). Thus, "it is not enough for the ALJ simply to list the relevant factors; he must also 'explain why the specific evidence relevant to each factor led him to conclude

---

2 Bjornson, because it is a Seventh Circuit case, is not binding precedent. Further, as noted by the magistrate judge, the decision to reverse and remand in Bjornson was not based on the ALJ's use of boilerplate language but, instead, on the ALJ's entire failure to "build a bridge between the medical evidence . . . and the conclusion that [plaintiff] is able to work full time in a sedentary occupation." 671 F.3d at 649. However, plaintiff also asserts that the Tenth Circuit similarly has found that such boilerplate language should require reversal. Therefore, the Court's analysis of plaintiff's alleged errors will focus on Tenth Circuit precedent.

[plaintiff's] subjective complaints were not credible.'" Id. (quoting Kepler, 68 F.3d at 391). If an ALJ's decision is supported by specific reasons, it may be affirmed, despite use of boilerplate language. See Keyes-Zachary, 695 F.3d at 1169-70.

In this case, the ALJ thoroughly reviewed both plaintiff's testimony and the medical evidence. Dkt. # 14-2, at 14. The structure of the ALJ's opinion supports both the RFC assessment and the credibility determination. The ALJ first reviewed plaintiff's testimony, and thereafter concluded that plaintiff was not entirely credible. Id. at 15. Although the ALJ used the boilerplate language in making his finding, he next fully reviewed plaintiff's medical records, including the evidence which supported his conclusion. Id. at 15-16. For example, the ALJ stated that, during plaintiff's examination at the emergency department following her automobile accident, plaintiff's "[r]esponse to the examination seemed exaggerated as she flinched with just a minimal touch." Id. at 15. The ALJ also noted that the MRIs of plaintiff's lumbar and thoracic spine were "unremarkable." Id. at 16. The ALJ further noted that, after plaintiff's hammertoe surgery, medical records revealed that "the wound looked fine, and her toe position was good." Id. Finally, as a further example, the ALJ noted that plaintiff was released from Dr. Knight's care because she "was found to have reached a maximum medical benefit." Id. The ALJ fully chronicled plaintiff's treatment, including that plaintiff had not sought medical treatment for pain and was taking only Tylenol in an over-the-counter strength for the pain, and he supported his credibility determination with a full review of plaintiff's medical records. Id. at 17. Therefore, the ALJ adequately "supported his ultimate credibility determination with specific evidence from the record." Sanders

v. Astrue, 266 Fed. Appx. 767, 770-71 (10th Cir. 2008) (unpublished)[3] (where ALJ used boilerplate language but the decision made "clear that all the evidence was considered, even if not discussed," use of boilerplate language was not reversible error). While the ALJ could have more closely tied his credibility finding to plaintiff's testimony and the medical evidence, the Court can adequately follow the ALJ's reasoning and is not required, in order to understand or explain the ALJ's conclusions, to insert any post hoc rationalizations. See Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2001). Plaintiff does not contest the substance of the ALJ's credibility assessment but, instead, she argues only that the ALJ's error was his use of the boilerplate language. However, "although the ALJ may not have identified any specific incredible statements as part of his evaluation of [plaintiff's] hearing testimony, his approach performed the essential function of a credibility analysis by indicating to what extent he credited what she said when determining the limiting effects of her symptoms." Keyes-Zachary, 695 F.3d at 1170. Therefore, the Court finds that the magistrate judge did not err in finding that use of the boilerplate language regarding plaintiff's credibility was not reversible error.

**B.**

Plaintiff's second objection is that the magistrate judge erred in finding that discrepancies or inconsistencies between information in the DOT and the VE's testimony was not reversible error. Dkt. # 19, at 3-4. Further, plaintiff alleges that the magistrate judge's reliance on the Occupational Information network (O*Net) was error and that, because the O*Net was used to justify the ALJ's decision, plaintiff should be granted an opportunity to cross-examine the VE regarding the O*Net

---

3 This and other unpublished decisions are not precedential, but are cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

and its application in comparison to the DOT. Id. In her opening brief, plaintiff made two specific arguments regarding the DOT information and the VE testimony. First, plaintiff argued that the VE's testimony that plaintiff could work as an assembler, laundry worker, or file clerk was not consistent with the DOT because the job numbers did not match the job titles. Dkt. # 15, at 7. Second, plaintiff argued that all three of the jobs cited by the VE required plaintiff to have contact with the general public, which conflicted with the ALJ's RFC assessment. Id. The magistrate judge found that, because the substance of the job description matching the DOT numbers provided by the VE is consistent with the VE's testimony, any discrepancy in job titles was not error. Dkt. # 18, at 16-17. In making his finding, the magistrate judge relied on O*Net job descriptions. Id. Further, the magistrate judge found that the job descriptions were consistent with the RFC assessment because the descriptions did not conflict with the ALJ's restriction that plaintiff not have contact with the general public. Id. at 17.

At step five, the Commissioner bears the burden to present sufficient evidence to support a finding of not disabled. Emory v. Sullivan, 936 F.2d 1092, 1094 (10th Cir. 1991). The Tenth Circuit has stated that "20 C.F.R. § 404.1566(d)(1) . . . suggests that an ALJ, since he or she has the burden at step five, must correlate a VE's testimony in an individual case with vocational information provided in the Dictionary of Occupational Titles or other reliable publications." Haddock v. Apfel, 196 F.3d 1084, 1089 (10th Cir. 1999). Pursuant to Social Security Ruling 00-4p, an ALJ "has an affirmative responsibility to ask about any possible conflict between that [VE] evidence and information provided in the DOT." Gibbons v. Barnhart, 85 Fed. Appx. 88, 93 (10th Cir. 2003) (unpublished) (alterations in original). But, the Tenth Circuit has found that, "[o]nce the

VE stated that he was relying on the DOT, the ALJ had no further duty to investigate." Gibbons, 85 Fed. Appx. at 93.

The Office of Administrative Law Judges of the United States Department of Labor has published the Dictionary of Occupational Titles online; but, the website states that "[t]he DOT, however, has been replaced by the O*Net." United States Department of Labor Office of Administrative Law Judges, Dictionary of Occupational Titles (4th ed. 1991) available at http://www.oalj.dol.gov/libdot.htm. O*Net Online also provides a DOT to O*Net "crosswalk," which allows a user to "[s]earch codes or titles from the [DOT]." O*Net Online, http://www.onetonline.org/crosswalk (last accessed January 14, 2013).

**1.**

Plaintiff first contends that "none of the listed jobs coincide with their descriptions in the [DOT]." Dkt. # 15, at 8. First, as to the job of assembler, the VE testified that the DOT number was 692.685-230, which corresponds with the job of trim attacher.[4] United States Department of Labor Office of Administrative Law Judges, Dictionary of Occupational Titles (4th ed. 1991), available at http://ww.oalj.dol.gov/libdot.htm. Second, as to the job of laundry worker, the VE testified that

---

[4] The DOT job description for trim attacher is: "[t]ends machine that applies metal binding to protect and decorate edges of wooden level bodies: Inserts strips of metal trim in vertical slots of machine. Stands level body on end under loaded slots and closes gate to lock level in place. Starts ram that forces metal corner strips into grooves in wooden body of level. Examines trimmed levels to detect split or splintered wood, or scratches and dents in metal binding. May install metal end plates on level bodies, using drill press and power screwdriver." Dictionary of Occupational Titles (4th ed. 1991), available at http://ww.oalj.dol.gov/libdot.htm.

the DOT number was 598.685-038; however, that number corresponds to dry cleaner.[5] Id. Finally, as to the job of file clerk, the VE testified that the DOT number was 206.367-014, and that number corresponds to file clerk II. Id. Insofar as plaintiff alleges that the job titles do not match the VE's testimony, plaintiff provides no citation or argument, other than conclusory statements, that these job descriptions are inconsistent with the VE's testimony or that such a discrepancy is reversible error. And, plaintiff fails to state why the ALJ had an affirmative duty to investigate any discrepancies once the VE testified that his testimony was consistent with the DOT. The VE testified that plaintiff could perform the job of assembler. The DOT contains several jobs entitled "assembler." http://www.occupationalinfo.org/dot_search.html (search for "assembler" and follow "Search" hyperlink). The job description for "Assembler, Small Products," DOT code 706.684-022, defines "assembler" as "[p]erforms any combination of following repetitive tasks on assembly line to mass produce products . . . Loads and unloads previously setup machines . . . light metal cutting operation on assembly line . . . May be assigned to different work stations." Office of Administrative Law Judges of the United States Department of Labor, Dictionary of Occupational Titles (4th ed. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07A.HTM. Further, the job description notes that the job "[m]ay be known according to product assembled." Id. Similarly, a "trim attacher" performs the task of loading and unloading a machine and assembly

---

5 The DOT job description for dry cleaner is: "[t]ends machine and drier that clean and dry knitted garments: Examines garment for soil and determines type of soil. Lays garment on cleaning board with spotted surface exposed. Applies soap solvent to spot with brush and removes excess soap with towel. Opens valve to admit cleaning fluid to tank of washing machine. Lays spotted garment in machine and starts machine. Stops machine after specified time, and removes and places garment in drier. Removes garment from dier and hangs garment on hook in clothes room. Turns fan on in clothes room to drive cleaning fluid fumes from clothes. Removes garment from clothes room." Dictionary of Occupational Titles (4th ed. 1991), available at http://ww.oalj.dol.gov/libdot.htm.

of a product by installing metal plates on "level bodies," and is closely related to a job of "assembler" in a field of metal or woodworking. Thus, the job description of trim attacher clearly contemplates assembly of a product. And, the job description of dry cleaner similarly contemplates work as a "laundry worker." Because of the only slight discrepancies between the VE's testimony and the DOT job title, the Court finds that such a minor discrepancy is not reversible error.

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). Harmless error analysis may be appropriate if "based on material the ALJ did at least consider (just not properly), [the court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004). If harmless error analysis is "too liberally embraced, it could obscure the important institutional boundary . . . [that] courts avoid usurping the administrative tribunal's responsibility to find the facts. Second . . . it risks violating the general rule against post hoc justification of administrative action." Id. (citing SEC v. Chenery Corp., 318 U.S. 80 (1943)).

The Tenth Circuit has discussed harmless error analysis in social security disability cases. Id. For example, the Tenth Circuit found, in Gay v. Sullivan, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993), that a minor technical error was not enough to "undermine confidence in the determination of th[e] case." Harmless error was also used when an "'ALJ's conduct, although improper, d[id] not require reversal' because the procedural impropriety involved had not 'altered the evidence before the ALJ.'" Allen, 357 F.3d at 1145 (citing Glass v. Shalala, 43 F.3d 1392, 1396-97 (10th Cir. 1994)).

In this case, the slight discrepancy in the actual job titles listed in the DOT and the job titled testified to by the VE is a minor technical error. Given that the actual titles were trim attacher and

dry cleaner, and that the job descriptions coincided with the job titles of assembler and dry cleaner testified to by the VE, such a slight technical error is not enough to undermine confidence in the ALJ's determination of the case. Therefore, the Court finds that any discrepancies between the job titles the VE testified to, which the ALJ relied on, and that contained in the DOT, was harmless error.

Further, to the extent the magistrate judge relied upon the O*Net in his decision, the DOT website clearly states that the DOT has been replaced by the O*Net, and, therefore, that was also not error. However, the Court finds that, because the O*Net is not necessary for determination of the issue, plaintiff's argument that such reliance requires remand so that she may cross-examine the VE regarding the O*Net fails.

**2.**

Plaintiff's second argument is that because, according to the DOT, the job codes for trim attacher and dry cleaner correspond to "complex" relationships with people, such a job requirement necessarily conflicts with the ALJ's RFC assessment that plaintiff have no contact with the general public.[6] Dkt. # 15, at 9. Appendix B of the DOT specifies that the fourth, fifth, and sixth digit of the code reflect "relationships to Data, People, and Things, respectively . . . [and] express a job's relationship to Data, People, and Things by identifying the highest appropriate function in each listing shown." United States Department of Labor Office of Administrative Law Judges, Dictionary of Occupational Titles, app. B (4th ed. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPB.HTM.

---

6 The Court's review is limited to the inconsistency between the DOT code and the ALJ's RFC assessment. Plaintiff did not object, in either her opening brief or her objection to the report and recommendation, to the substance of the ALJ's RFC assessment.

The "People" category has a range from zero to eight. Id. The DOT specifies that eight corresponds to a worker function of "Taking Instructions - Helping," which is defined as "[a]ttending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to 'non-learning' helpers." Id. And, six corresponds to a worker function of "Speaking - Signaling," which is defined as "[t]alking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants." Id.

It is not clear whether zero or eight requires the highest level of ability. A zero means a worker function of "Mentoring," which is defined as "[d]ealing with individuals in terms of their total personality in order to advise, counsel, and/or guide them with regard to problems that may be resolved by legal, scientific, clinical, spiritual, and/or other professional principals." Id. Thus, from a simple comparison of the worker functions of "Mentoring" and "Taking Instructions - Helping," it appears that "Mentoring" requires a higher level of ability to interact with other people or the public. See id.

The fifth digit of the DOT code for both trim attacher and dry cleaner is eight, and the fifth digit of the code for file clerk is six. Plaintiff argues that, because six and eight require a high level of ability to interact with people, those jobs necessarily conflict with the ALJ's RFC assessment that plaintiff could have no contact with the general public. However, neither job description involves contact with the general public. Similarly, the definitions of the worker functions do not require contact with the general public. Instead, "Taking Instructions - Helping" relates only to "orders of supervisor[s]." Id. As to "Speaking - Signaling," that worker function definition merely intimates contact with "helpers or assistants." Id. Despite plaintiff's argument to the contrary, neither

definition conflicts with the ALJ's RFC assessment that plaintiff have no contact with the general public. Instead, both job worker functions contain possible contact with co-workers or supervisors and no contact with the general public. Therefore, the Court finds that the magistrate judge did not err in finding that any discrepancy between the DOT codes testified to by the VE and the actual DOT job titles was not reversible error.

**IT IS THEREFORE ORDERED** that the report and recommendation (Dkt. # 18) is **accepted**. The Commissioner's decision to deny plaintiff's claim for disability benefits and supplemental security income is **affirmed**. A separate judgment is entered herewith.

**DATED** this 17th day of January, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE